Rebecca R. Dunnan (DC Bar No. 90019733)
Email: DunnanrR@sec.gov
Telephone: (202) 551-3813
Facsimile: (703) 420-6032

H. Norman Knickle (RI Bar No. 4957)
Email: KnickleN@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, NE
Washington DC 20549

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>LIXIN AZARMEHR, JL REAL ESTATE DEVELOPMENT CORPORATION, NEVADA SKILLED NURSING LENDER, LLC, and NEVADA SKILLED NURSING DEVELOPMENT, LLC,<br><br>Defendants. | Case No. 2:24-cv-707<br><br>**COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiff Securities and Exchange Commission (the "SEC" or "Commission"), for its Complaint against Defendants Lixin Azarmehr ("Azarmehr"), JL Real Estate Development Corporation ("JL REDC"), Nevada Skilled Nursing Lender, LLC ("Lender"), and Nevada Skilled Nursing Development, LLC ("Developer") (collectively, the "Defendants"), alleges as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27(a) of the Securities and Exchange Act ("Exchange

COMPLAINT                                              1

Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa.

2. In connection with the conduct alleged in this Complaint, the Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa(a)], because certain of the transactions, practices, or courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Defendants transact business in this district, Azarmehr resides in this district, and Developer maintains an office in this district.

**SUMMARY**

4. This case involves a fraudulent scheme perpetrated by Azarmehr and three entities she manages — JL REDC, Lender, and Developer — to use funds solicited for the development of three skilled nursing home facilities in the Las Vegas, Nevada area (the "Nevada Project") for an unrelated real estate project contrary to disclosures to investors.

5. From at least September 2015 through March 2018, Azarmehr and others acting on behalf of these entities offered and sold securities in the Nevada Project, raising $14 million from 28 investors. The Defendants structured these investments to comply with the federal U.S. Citizenship and Immigration Service's ("USCIS") EB-5 Immigrant Investor Program ("EB-5 Program"). Under the EB-5 Program, investors are eligible for ten-year permanent residency visas ("Green Cards") to live and work in the United States if they make a qualifying investment in a new commercial enterprise in the United States that creates or preserves a certain number of permanent full-time jobs for qualified U.S. workers.

6. In offering documents for the Nevada Project, Azarmehr and Lender represented to investors that the project met the qualifications of the EB-5 Program and that investor funds would be used solely for the construction and administration of the Nevada Project, through loans from Lender to Developer. But instead of allocating these investments as promised, the Defendants redirected most of the money raised for other purposes.

COMPLAINT                                                 2

7. In March of 2017, Azarmehr, on behalf of Developer and JL REDC, pledged $10 million in investor funds as collateral to support JL REDC's receipt of a priority credit line from Bank A (the "PCL" or the "PCL Account"). The PCL had lower interest rates than other lines of credit available to JL REDC at the time. JL REDC then used the PCL to pay off a higher interest rate loan for a separate JL REDC real estate venture – an uncompleted mixed-use project located at 631 S. Vermont Avenue, near the Koreatown neighborhood of Los Angeles (the "Vermont Project"). Using the investor fund-backed PCL saved JL REDC substantial costs in interest payments.

8. For almost four years (from March 2017 to February 2021), the pledged investor funds were subject to seizure by Bank A if JL REDC did not meet its obligations. The Nevada Project offering documents did not disclose to investors that investor funds could be used by or for JL REDC. Nor did they disclose that investor funds were at risk as pledged collateral for an unrelated real estate debt. While these funds were securing the PCL, they were also unavailable for their promised use – the construction of three skilled nursing facilities in the Las Vegas area.

9. To date, none of the EB-5 investors have received a Green Card in connection with their investment in the Nevada Project.

10. By engaging in this conduct and as alleged further herein, all Defendants violated the antifraud provisions of Section 17(a)(1), (2), and (3) of the Securities Act, 15 U.S.C. § 77q(1-3) and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §240.10b-5(a) and (c). Additionally, by engaging in this conduct and as alleged further herein, Defendants Azarmehr and Lender violated Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder, 17 C.F.R. §240.10b-5(b).

**THE DEFENDANTS**

11. **Azarmehr**, age 56, is a resident of Las Vegas, Nevada, and has been licensed to practice law in California since 2008. She has worked primarily in the areas of real estate development and immigration law for the past twenty years. Azarmehr is the co-founder of JL REDC, and she is and has been its Chief Executive Officer since its founding in 2015. Azarmehr also has an ownership interest in JL REDC. Azarmehr has never been registered with the SEC in

any capacity.

12. **JL Real Estate Development Corporation** ("JL REDC") is a real estate company focused on developing projects in southern California and Nevada. JL REDC is a California close corporation with its headquarters located at 707 Wilshire Boulevard in Los Angeles. JL REDC advertises renderings of three projects on its publicly available website: (1) the Nevada Project; (2) the Vermont Project; and (3) the "Rocca Project," a planned residential complex located in the Bel Air neighborhood of Los Angeles. Since at least 2015, JL REDC has at times done business in the United States as "Jia Long USA" or "Jia Long Group USA," although it is not registered in Nevada, California, or elsewhere under either name.

13. **Nevada Skilled Nursing Lender, LLC** ("Lender") was incorporated in 2015 as a Nevada limited liability company. Lender is the issuer of the securities in this case and was created to raise capital under the EB-5 Program. Lender sold such securities in the form of LLC units under a private placement memorandum ("PPM") purporting to qualify for the registration exemption under Section 4(2) of the Securities Act.

14. **Nevada Skilled Nursing Development, LLC** ("Developer") was created in 2015 as a Nevada limited liability company. Lender functioned as a vehicle to receive investor funds to loan to Developer. Developer then functioned as the job-creating entity for the purposes of EB-5 Program eligibility.

## ASSOCIATED PARTIES

15. **Nevada Investment Regional Center, LLC** ("NIRC") was created in 2013 as a Nevada limited liability company. NIRC serves as a "regional center," which was set up to administer investments in the EB-5 Program as required by USCIS. Azarmehr and two other individuals are listed as the managing members of NIRC.

16. **Lender Manager, LLC** ("Manager") is another Nevada limited liability company incorporated by Azarmehr in 2015. At all relevant times, Manager was a wholly owned subsidiary of NIRC. In turn, Manager managed Lender.

17. The co-founder and Chairman of JL REDC ("Co-Founder") is a resident of Beijing, China. On JL REDC's publicly available website, Co-Founder's biography states he is the founder

COMPLAINT
4

and owner of several real estate development projects in Beijing, Hainan, Hong Kong, and Shenzhen. The website claims that the assets of Co-Founder's Beijing-based company total over $3 billion.

18.     **Jia Long Holdings, LLC** ("Jia Long") is a Nevada limited liability company that was formed in 2015. Azarmehr and Co-Founder are also the managers of Jia Long, each with an ownership interest in the company. At all relevant times, Jia Long was the manager of Developer.

## THE FRAUDULENT SCHEME

**A.  The Nevada Project EB-5 Offering**

19.     On September 4, 2015, Azarmehr founded the various Nevada Project entities — Lender, Developer, and Manager — to raise money and ultimately build three skilled nursing facilities. The plan for these facilities was to develop 15-acres in the Las Vegas and Henderson areas to house more than 400 beds licensed to provide room, board, and specialized nursing care for senior citizens. The projected cost to acquire land and develop the three facilities constituting the Nevada Project was approximately $69 million. The Nevada Project planned to raise $57 million from 114 foreign investors, and an additional $12 million from private equity contributions.

20.     To attract foreign investment, Azarmehr sought to qualify the Nevada Project under the EB-5 Program. On March 17, 2014, Azarmehr filed an application ("Form I-924") with USCIS to create such an investment opportunity through NIRC. On July 15, 2014, USCIS conditionally granted the application. In 2015 and 2016 addendums to the original Form I-924, Azarmehr identified Lender as the new commercial enterprise (investment vehicle) and Developer as the job-creating entity to be considered under the EB-5 Program. Azarmehr signed these USCIS applications as the managing member of NIRC.

21.     On or about September 2015, Azarmehr oversaw the creation of a "Business Plan," a confidential PPM, and a "Subscription Agreement" (the "Nevada Project Offering Documents") for the purpose of partially financing the Nevada Project through an EB-5 offering (the "Nevada Project Offering"). Azarmehr reviewed the Nevada Project Offering Documents before they were provided to investors. As the manager and officer of the Nevada Project entities, Azarmehr signed the Subscription Agreement, which incorporated the terms of the PPM, on behalf of Lender,

Manager, and NIRC. The PPM also directed that "[a]ll inquiries concerning this offering memorandum and the offering" be directed to Azarmehr.

22. The Nevada Project Offering solicited an investment of $500,000 from each EB-5 investor with an added $50,000 administrative fee to be paid into a different bank account. For each $500,000 investment, an investor received one of the 114 units in Lender. If all 114 units were sold, Lender would raise a total of $57 million.

23. The Nevada Project Offering Documents limited Developer's use of investor funds to the construction and operation of the Nevada Project. Specifically, the PPM stated:

> "[Lender] intends to use the net proceeds from the sale of the Units to make the Loan to the [Developer], **which will use the proceeds for working capital, and for other general corporate purposes**, **to begin construction and facility operations of one of three planned skilled nursing facilities in the Las Vegas-Henderson NV area**, as more fully described in the Business Plan in Exhibit B. The [Developer] plans projects involving the construction and operation of three 143-bed skilled nursing facilities located in (i) East Las Vegas, Nevada, (ii) Henderson, Nevada, and (iii) South West Las Vegas, Nevada. The [Lender] will make the Loan for these three projects, to be determined by the Manager in its sole discretion" (emphasis added).

24. Similarly, the Business Plan represented that loan proceeds would be used to develop the Nevada Project: "[Developer] will use the proceeds of the loan and contribute funds as capital contribution to each of the Project's developments."

25. These representations that investor funds would be used to develop and operate three skilled nursing facilities and create jobs through the Nevada Project were material because these were requirements upon which investors' eligibility for the EB-5 Program depended. The creation or preservation of a certain number of permanent full-time jobs is necessary for each investor to qualify for a Green Card. Based on the language in the Nevada Project Offering Documents, investors could reasonably expect that their investments would be used in furtherance of that goal and not diverted for unrelated projects that did not further their ability to obtain a Green Card.

26. The Nevada Project Offering Documents also claimed that investors could expect to receive a return on their investment if the project was successful. The PPM promised that the loan from Lender to Developer would "accrue simple interest at 3.0% per annum." Developer would make "interest-only payments of one (1%) percent on each anniversary of the loan agreement until

COMPLAINT 6

the Loan Maturity date." "At the end of the Term, the [Developer] will be required to promptly pay in full to the [Lender] the outstanding loan amount, and all accrued but unpaid interest." The "Term" of the loan was defined as "the earlier to occur of (a) five years after the date of the Loan or (b) the sale of the business by the [Developer] ("Loan Maturity")."

27. In sum, investors reasonably expected to receive (1) the ability to apply for a Green Card if the Nevada Project met the EB-5 Program requirements, and (2) accrued interest of 1% as well as a return of their principal at the end of the loan Term.

28. The Nevada Project Offering Documents explained that each investor's investment was subject to "risk factors" that could cause "a possible total loss of investment." The PPM explicitly identified those risks as relating to (1) "Immigration & The EB-5 Visa Program," (2) "The Loan," and (3) "Borrower's Operations." With respect to the loan, the PPM acknowledged that the "high degree of risk involved with the ability of the [Developer] to repay the Loan" was based in part on Developer's "ability not only to construct and operate skilled nursing facilities, but to populate those facilities so that they will operate profitably."

29. None of the Nevada Project Offering Documents identified any risk to investors' expected return or EB-5 eligibility arising from their investments being pledged as collateral for outstanding debts from an unrelated business venture. Nor did the Offering Documents identify any risk related to unrelated real estate projects, such as JL REDC's Vermont Project. In fact, the Nevada Project Offering Documents made no mention or reference to JL REDC or the Vermont Project at all.

**B. Solicitation of Investors**

30. Beginning in September 2015, Co-Founder and agents working on behalf of the Nevada Project Offering solicited investors. Co-Founder primarily solicited investors in China by sharing the Nevada Project Offering Documents and other marketing materials to promote the project. Promotional materials circulated for the Nevada Project listed "Jia Long Group USA" as the developer.

31. Azarmehr was aware that these marketing materials were created and disseminated to investors. She also developed marketing materials of her own. For instance, on December 30,

COMPLAINT 7

2015, Azarmehr sent a draft newsletter to her assistant for revision and formatting. The newsletter described the Nevada Project as operated by "Jia Long USA." The website provided in the newsletter for Jia Long USA redirects to the JL REDC website. Since at least 2016 through the date of this Complaint, JL REDC's website has advertised the Nevada Project as one of its real estate development projects.

32. Starting in September 2015 and continuing until at least March 2018, 28 investors participated in the Nevada Project Offering and invested a total of $14 million. Each investor invested approximately $500,000. Some investors also paid a $50,000 administrative fee. As outlined in the Nevada Project Offering Documents, between 2015 and 2018, each investor sent their investment to a holding account at Bank A controlled by Lender (the "Investor Holding Account").

33. Between 2015 and 2018, Lender executed eight promissory notes to loan a total of approximately $14 million in investor funds to Developer, as described in the Nevada Project Offering Documents. Lender transferred these funds from the Investor Holding Account to Developer's bank account at Bank B ("Developer's Operating Account"). As of March 15, 2017, Developer held approximately $10 million in funds raised from investors in the Nevada Project Offering in Developer's Operating Account. Azarmehr knew that the funds in Developer's Operating Account were investor funds for use in the Nevada Project.

**C. The Defendants Misappropriated and Misused Investor Funds**

34. Also in March of 2017, JL REDC's $12 million loan for the Vermont Project was coming due. Azarmehr knew this debt had to be repaid or extended by March 31, 2017, or Bank C would apply an interest rate of 24% per year.

35. On or about March 14, 2017, Azarmehr opened a new account with Bank A in the name of Developer (the "Investor Collateral Account"), as well as a priority credit line account in the name of JL REDC (the "PCL" or the "PCL Account"). The Investor Collateral Account was funded with the $10 million in investor funds that were loaned from Lender to Developer in accordance with the Nevada Project Offering Documents.

36. On or about March 17, 2017, Azarmehr, acting on behalf of both Developer and JL

REDC, pledged the funds in the Investor Collateral Account as a guaranty for obligations incurred by the PCL Account. Specifically, Azarmehr granted a "continuing first priority perfected security interest" in all assets held in the Investor Collateral Account to Bank A. This was part of ensuring repayment of the credit Bank A had extended to JL REDC in the PCL Account.

37. Throughout March 2017, Azarmehr discussed her intentions for the Investor Collateral Account and the PCL Account with representatives from Bank A. For instance, on or about March 20, 2017, contemporaneous notes taken by Bank A personnel indicate that Azarmehr and a bank representative discussed Azarmehr's plan to use the PCL funds for investment and "bridge financing" and that Azarmehr did not have immediate plans to pay off the PCL. Notes further indicate that Azarmehr and a representative from Bank A discussed that money wired out of the PCL would be used for funding, finishing up projects, or repaying previously provided financing.

38. On or about March 27, 2017, Azarmehr directed Bank A to wire $8.99 million from the newly opened PCL Account to Bank C to pay off the remaining balance of JL REDC's loan for the Vermont Project. JL REDC's debt to Bank C accrued interest at a rate of 7.9%, whereas the new investor fund-backed PCL had a rate of only 3.1%. From that point forward, the Investor Collateral Account was at risk if JL REDC failed to repay the PCL for JL REDC's Vermont Project debt, which had nothing to do with the Nevada Project.

39. The funds in the Investor Collateral Account were also in jeopardy for other reasons. Under the terms of the PCL, the value of the securities and mutual funds backing JL REDC's loan from Bank A could increase or decrease in response to market fluctuations, interest rates, general economic conditions, and other factors. If the value of this backing fluctuated, so too would the value of the Investor Collateral Account supporting the PCL. "[I]n order to maintain the required equity" in the Investor Collateral Account, Bank A could "force the sale of securities or other assets" in the Investor Collateral Account without notice to Azarmehr, without allowing Azarmehr to decide which securities or assets would be sold, and without allowing Azarmehr an opportunity to provide additional funds or assets. These demands for further cash or securities to cover losses to the PCL are known as margin calls. Azarmehr personally signed an agreement with these terms and

appeared before a notary public on March 17, 2017 to do so.

40. In fact, between November 30, 2018 and January 14, 2020, Bank A required such additional funding to cover eight margin calls on the Investor Collateral Account. On at least three of these occasions, Azarmehr and other JL REDC employees approved the transfer of funds from the Investor Collateral Account to satisfy these margin calls. However, during this same timeframe, Bank A also automatically transferred funds from the Investor Collateral Account to the PCL Account under the terms that Azarmehr agreed to.

41. By January 2020, a total of $1,177,416.19 had been transferred from the Investor Collateral Account to the PCL Account to cover JL REDC's obligations.

42. From March 2017 to February 2021, Azarmehr, acting on behalf of Lender and Developer, continuously pledged the funds in the Investor Collateral Account as collateral for the PCL Account. During these almost four years, Azarmehr, Lender, and Developer could not use these investor funds for the construction and development of the Nevada Project as promised.

43. Even after $10 million in investor funds were pledged as collateral for the PCL, the Defendants received four additional EB-5 investments in the Nevada Project. These investors signed the same Nevada Project Offering Documents, which contained no disclosures about the misappropriation of prior investments. That omission was materially misleading because investors would reasonably want to know that, to date, most of the EB-5 investor funds had not been spent on the EB-5 project they were investing in. Instead, the funds were pledged to resolve JL REDC's unrelated debt and thus not available for the development of three skilled nursing facilities and the creation of jobs, which these investors' eligibility for a Green Card depended upon. At the time when Azarmehr, on behalf of Lender, accepted additional EB-5 investments after establishing the Investor Collateral Account she knew, or was reckless or negligent in not knowing, about the misappropriation of investor funds and their diversion to an unrelated JL REDC project.

44. Gradually, through a series of repayments, all the EB-5 investor funds that were transferred to the PCL were returned to the Investor Collateral Account by February 9, 2021. The funds were then returned to the Developer Operating Account and the Investor Collateral Account was closed.

45.     As of the date of this Complaint, the Nevada Project has not been completed as originally designed, and none of the 28 EB-5 investors have received a Green Card from their investment in the Nevada Project.

**D.  Investments in the Nevada Project Offering Were Securities**

46.     The Defendants offered and sold securities under the federal securities laws to the investors of the Nevada Project Offering.

47.     As part of the Nevada Project Offering, investors made an investment of approximately $500,000 toward the development of the Nevada Project. This complied with the regulations governing the EB-5 Program, which included that investors place "the required amount of capital at risk for the purpose of generating a return in the capital placed at risk." *See* 8 C.F.R. § 204.6.

48.     Lender pooled the investor funds it received as part of a common enterprise to make a loan to Developer for the Nevada Project. In exchange for his/her investment, each investor received a unit in Lender entitling him/her to the same rights and expectation of benefits from participating in the Nevada Project Offering.

49.     Each investor expected to receive his/her capital contribution returned as well as interest accruing on the loan from Lender to Developer.

50.     The terms of the Nevada Project Offering Documents reflected that this accrual of interest required investors to rely on the efforts of Azarmehr, Lender, Developer, and their employees and agents to generate a return sufficient to repay the loan from Lender to Developer with interest. The terms of the Nevada Project Offering Documents also represented that management control of investments in the Nevada Project was vested in the hands of Azarmehr, Lender, and Developer and not the investors.

51.     In addition, the Nevada Project Offering Documents acknowledged that investors were being offered "securities" that were purportedly exempt from the registration requirements of the federal securities laws.

### E. Defendants Acted With Scienter

52. Because of her role overseeing the creation of the Nevada Project Offering Documents, Azarmehr knew, or was reckless or negligent in not knowing, that the investor funds raised in the Nevada Project Offering were to be used on the Nevada Project. Azarmehr also knew, or was reckless or negligent in not knowing, that the Nevada Project Offering Documents did not contain any disclosures about JL REDC's use of the EB-5 investor funds or any risks arising from JL REDC's use of the funds for business expenditures or the Vermont Project. Azarmehr also knew, or was reckless or negligent in not knowing, that the Nevada Project had no relation to the Vermont Project.

53. Azarmehr knew, or was reckless or negligent in not knowing, that by pledging the funds in the Investor Collateral Account as collateral for the PCL Account, she was directing investor funds for purposes that were unrelated to the Nevada Project. Azarmehr also knew, or was reckless or negligent in not knowing, that the interest rate on the PCL Account was lower than the interest rate that JL REDC would pay on the Bank C line of credit on the Vermont Project, and that JL REDC would save money by repaying Bank C's line of credit.

54. In addition, Azarmehr knew, or was reckless or negligent in not knowing, that pledging funds from the Investor Collateral Account exposed them to losses not anticipated by the Nevada Project Offering Documents. The account opening agreement she signed made it clear that once pledged as collateral, the funds in the Investor Collateral Account could be used by Bank A at any time and without further action or authorization by her if JL REDC did not repay the PCL under Bank A's terms or if the value of the PCL fluctuated. Finally, Azarmehr knowingly, recklessly, or negligently allowed funds from the Investor Collateral Account to be used to cover margin calls arising from the PCL Account.

55. Azarmehr's scienter is attributable to each entity defendant by virtue of her position or degree of control over each. Lender, Developer, and JL REDC each misappropriated investor money by acting through Azarmehr, and her state of mind is therefore imputed to each.

### F. Tolling Agreements

56. Azarmehr, Lender, Developer, and JL REDC have entered into tolling agreements

with the SEC, tolling the statute of limitations applicable to this action for the period of March 7, 2022 to April 7, 2024.

## CLAIMS FOR RELIEF

### First Claim for Relief
**Fraud in the Offer or Sale of Securities**
**(Violations of Section 17(a) of the Securities Act Against All Defendants)**

57. The SEC re-alleges and incorporates by reference paragraphs 1 through 56 above.

58. During the relevant time period, each Defendant, directly or indirectly, in the offer or sale of securities by the use of means or instrumentalities of interstate commerce or by use of the mails, knowingly, recklessly, or negligently: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser. As alleged above, Defendants knowingly, recklessly, or negligently engaged in deceptive conduct and made materially false statements and misleading omissions concerning how investors' funds would be used, by pledging investor money as collateral for JL REDC's debts that were unrelated to the Nevada Project. That information, had it been disclosed, would have been significant information to investors, because it would have affected the investors' understanding of the overall terms, conditions, risks, and costs associated with their EB-5 investments.

59. By engaging in the conduct described above, each of the Defendants violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### Second Claim for Relief
**Fraud in Connection with the Offer or Sale of Securities**
**(Violations of Section 10(b) of the Exchange Act and**
**Rules 10b-5(a) and (c) Thereunder Against All Defendants)**

60. The SEC re-alleges and incorporates by reference paragraphs 1 through 56 above.

61. During the relevant time period, each Defendant, directly or indirectly, in connection with the offer or sale of a security, and by the use of means or instrumentalities of interstate

commerce or by use of the mails, knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons. Defendants knowingly or recklessly engaged in deceptive conduct concerning how investors' funds would be used, by pledging investor money as collateral for JL REDC's debts that were unrelated to the Nevada Project. That information, had it been disclosed, would have been significant information to investors, because it would have affected the investors' understanding of the overall terms, conditions, risks, and costs associated with their EB-5 investments.

62. By engaging in the conduct described above, each Defendant violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5] thereunder.

### Third Claim for Relief
**Fraud in Connection with the Purchase or Sale of Securities**
**(Violations of Sections 10(b) of the Exchange Act and Rules 10b-5(b) Thereunder Against Defendants Azarmehr and Lender)**

63. The SEC re-alleges and incorporates by reference paragraphs 1 through 56 above.

64. During the relevant time period, Defendants Azarmehr and Lender, directly or indirectly, in connection with the offer or sale of a security, and by the use of means or instrumentalities of interstate commerce or by use of the mails, (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. As alleged above, Defendants Azarmehr and Lender knowingly or recklessly made materially false statements and misleading omissions concerning how investors' funds would be used. That information, had it been disclosed, would have been significant information to investors, because it would have affected the investors' understanding of the overall terms, conditions, risks, and costs associated with their EB-5 investments.

65. By engaging in the conduct described above, Defendants Azarmehr and Lender violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5] thereunder.

# PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that this Court enter a Final Judgment:

## I.

Finding that Defendants committed the violations alleged in this Complaint.

## II.

Permanently enjoining Defendants and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 78q(a); Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## III.

Permanently enjoining Defendants from, directly or indirectly, (1) participating in the offer or sale of any security which constitutes, or is promoted as constituting, a qualifying investment in a "commercial enterprise" under the United States Government EB-5 visa program administered by the United States Citizenship and Immigration Service; and (2) participating in the management or supervision of, or otherwise exercising any control over, any commercial enterprise or project that has issued or is issuing any securities which constitute, or are promoted as constituting, qualifying investments under the EB-5 visa program.

## IV.

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7), 15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7).

## V.

Ordering Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

**VI.**

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII.**

Granting such other and further relief as this Court may determine to be just and necessary.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action of all issues so triable.

Dated: April 11, 2024

*s/ Rebecca R. Dunnan*
Rebecca R. Dunnan
H. Norman Knickle*
Attorneys for Plaintiff
Securities and Exchange Commission

*Pending Motion to Permit Appearance